**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT,<br><br>        Plaintiff,<br><br>v.<br><br>ARISTA NETWORKS, INC.,<br><br>        Defendant. | CIVIL ACTION NO. 6:20-cv-01083-ADA<br><br><br>JURY TRIAL DEMANDED |

## WSOU (BRAZOS'S) RESPONSIVE CLAIM CONSTRUCTION BRIEF

# TABLE OF CONTENTS

I.     Introduction ...............................................................................................................1

II.    Legal Standards .........................................................................................................1

III.   Argument ...................................................................................................................3

      A.     U.S Patent No. 7,409,715 ............................................................................. 3

            1.     "means for transmitting outgoing data frames over a wireless interface" ..............................................................................................3

            2.     "connection means between the wireless node and the intrusion detection module for providing the intrusion detection module with a copy of the original data frames" .................................................6

      B.     U.S Patent No. 8,472,447 ............................................................................. 6

            1.     "aggregation switch" ......................................................................6

            2.     "Chassis Management Module" ......................................................7

                    a)     Chassis Management Module is a Well-Known Term of Art Not Subject to Means-Plus-Function Treatment. .................... 8

                   b)     The Specification Discloses Sufficient Structure for the Functions Performed by the Chassis Management Module in the Claims. ................................................... 15

            3.     "multicast index" ..........................................................................20

      C.     U.S Patent No. 9,450,884 ........................................................................... 25

            1.     "the network switching element" ..................................................25

                    a)     A POSITA Would Ascertain the Scope of "The Network Switching Element" with Reasonable Certainty in the Context of the Specification ......................................... 26

                   b)     A POSITA Would Ascertain the Scope of "The Network Switching Element" with Reasonable Certainty in the Context of the Prosecution History .............................. 29

IV.   Conclusion ...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) ................................................................................8

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ................................................................................5

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017) ..............................................................................26

*Beacon Adhesives, Inc. v. United States*,
   134 Fed. Cl. 26 (2017) ............................................................................................10

*Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*,
   No. 6:15-CV-163-JDL, 2016 WL 1228767 (E.D. Tex. Mar. 28, 2016) ........8, 11, 14

*Cultor Corp. v. A.E. Staley Mfg. Co.*,
   224 F.3d 1328 (Fed.Cir.2000) .................................................................................21

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
   469 F.3d 1005 (Fed. Cir. 2006) ............................................................................8, 10

*Dyfan, LLC v. Target Corp.*,
   No. W-19-CV-00179-ADA, 2020 WL 8617821 (W.D. Tex. Nov. 25, 2020) ..........11

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
   No. CV 16-01824-RSWL-SPX, 2017 WL 2783486 (C.D. Cal. May 18, 2017),
   *aff'd*, 830 F. App'x 634 (Fed. Cir. 2020) .................................................................10

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
   435 F.3d 1366 (Fed. Cir. 2006) ................................................................25, 26, 28, 30

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
   240 F. Supp. 3d 605 (E.D. Tex. 2017) .......................................................................2

*Finisar Corp. v. DirecTV Group, Inc.*,
   523 F.3d 1323 (Fed. Cir. 2008) .................................................................................2

*Flash-Control, LLC v. Intel Corp.*,
   No. 1:19-CV-01107-ADA, 2020 WL 4561591 (W.D. Tex. July 21, 2020),
   *aff'd*, No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) .................26, 28

*Grecia v. Samsung Elecs. Am., Inc.*,
   780 F. App'x 912 (Fed. Cir. 2019) ...........................................................................11

*Huawei Techs. Co. v. Verizon Commc'ns, Inc.*,
No. 2:20-CV-00030-JRG, 2021 WL 150442 (E.D. Tex. Jan. 15, 2021) ...............................14

*In re Downing*,
754 F. App'x 988 (Fed. Cir. 2018) .........................................................................................25

*In re Packard*,
751 F.3d 1307 (Fed. Cir. 2014)..............................................................................................25

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
887 F.2d 1050 (Fed. Cir. 1989)................................................................................................2

*JVW Enters., Inc. v. Interact Accessories*,
424 F.3d 1324 (Fed. Cir. 2005)................................................................................................3

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
554 F.3d 1010 (Fed. Cir. 2009)..............................................................................................10

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) .........................................1

*Microsoft Corp. v. I4I Ltd. P'ship*,
564 U.S. 91 (2011)..................................................................................................................26

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)..................................................................................................................2

*Permutit Co. v. Graver Corp.*,
284 U.S. 52 (1931)..................................................................................................................30

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc).................................................................2, 21, 26

*Primos, Inc. v. Hunter's Specialties, Inc.*,
451 F.3d 841 (Fed. Cir. 2006)................................................................................................22

*Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*,
No. 16-CV-05251-EJD, 2017 WL 4410174 (N.D. Cal. Oct. 4, 2017) .........................9, 11, 14

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998)................................................................................................1

*Saint Lawrence Communications LLC v. Apple Inc.*,
2:16-CV-82-JRG, 2017 WL 2874526 (E.D. Tex. July 5, 2017)............................................21

*SecurityProfiling, LLC v. Trend Micro Am., Inc.*,
No. 3:17-CV-1484-N, 2018 WL 4585279 (N.D. Tex. Sept. 25, 2018) ................................8, 9

*SEVEN Networks, LLC v. Apple Inc.*,
   2:19-CV-115-JRG, 2020 WL 1536152 (E.D. Tex. Mar. 31, 2020)........................................21

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
   511 F.3d 1132 (Fed. Cir. 2007)........................................................................................20, 21

*Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*,
   810 F.2d 1113 (Fed.Cir.1987)..........................................................................................28, 30

*Sol IP, LLC v. AT&T Mobility LLC*,
   2:18-CV-00526, 2019 WL 6878836 (E.D. Tex. Dec. 17, 2019) ............................................21

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   No. 13-854, slip op. (S. Ct. Jan. 20, 2015) .............................................................................1

*Total Rebuild, Inc. v. PHC Fluid Power, L.L.C.*,
   No. 6:15-CV-1855, 2019 WL 2448305 (W.D. La. June 10, 2019) ........................................15

*U.S. Well Servs., LLC v. TOPS Well Servs.*,
   No. 3:19-CV-00237, 2020 WL 9439469 (S.D. Tex. Sept. 18, 2020) .....................................15

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).................................................................................................1

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (*en banc*) ................................................................... *passim*

*Zeroclick, LLC v. Apple Inc.*,
   891 F.3d 1003 (Fed. Cir. 2018)................................................................................................7

**Statutes**

35 U.S.C. § 112 ¶ 2 ..........................................................................................................................25

35 U.S.C. § 112 ¶ 6 ...........................................................................................................7, 8, 14, 15

## I.    <u>INTRODUCTION</u>

Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development ("Brazos") asserts that Defendant Arista Networks, Inc. infringes certain claims of U.S. Patent Nos. 7,409,715 (the "'715 Patent"), 8,472,447 (the "'447 Patent"), and 9,450,884 (the "'884 Patent"). Arista makes, uses, sells, and offers for sale several network components integrating the technology claimed in these patents including switches and access points.

Arista attempts to avoid liability by proposing constructions unsupported by or inconsistent with the intrinsic and extrinsic evidence. When not ignoring the intrinsic evidence, Arista improperly imports limitations from the specification into the claims. Arista also attempts to transform a well-known term of art—a specific hardware device often found in chassis switches that can be purchased off the shelf—into a means-plus-function term in hopes the Court will find this known term indefinite. For the reasons explained below, the Court should adopt Brazos's claim constructions and reject those offered by Arista.

## II.    <u>LEGAL STANDARDS</u>

The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claim construction is a matter of law but may involve subsidiary questions of fact. *Id.* at 979; *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, No. 13-854, slip op. at 7 (S. Ct. Jan. 20, 2015). Intrinsic evidence—the patent claim language, specification, and prosecution history, considered in this order of importance—is the primary source of guidance as to the meaning of the claim terms. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed. Cir. 1996). But "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

"Generally this court gives claim terms their ordinary and customary meanings, according to the customary understanding of an artisan of ordinary skill at the time of the invention." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). The Federal Circuit has repeatedly held "that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is *meant* by a word *in* a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (internal quotation marks omitted).

A claim is not indefinite if the claim, "viewed in light of the specification and prosecution history, inform[s] those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[A]bsolute precision is unattainable," and therefore "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id.* (internal quotation marks omitted). "The facts giving rise to a finding of indefiniteness must be proved by clear and convincing evidence. That is, overcoming the presumption of patent validity 'demands clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim.'" *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 240 F. Supp. 3d 605, 624 (E.D. Tex. 2017) (citations omitted).

III.   **ARGUMENT**

A.   **U.S Patent No. 7,409,715**

The '715 patent – titled "Mechanism for detection of attacks based on impersonation in a wireless network" – provides method and system claims directed to intrusion detection systems and in particular to a mechanism for detecting attacks based on impersonation in a wireless network. Two means-plus-function terms are at issue before the Court.

1.   *"means for transmitting outgoing data frames over a wireless interface"*

| Claim Language | Brazos's Construction | Defendant's Construction |
|---|---|---|
| "means for transmitting outgoing data frames over a wireless interface" ('715: 17) | Means-plus-function<br><br>Function: transmitting outgoing data frames over a wireless interface via a transmitter<br><br>Structure: the node 10 of a wireless network in accordance with the procedure set forth, *e.g.*, in the specification at 3:64–4:4; 4:16–23; 4:26–27; 4:44–48; and Figs. 1–2 as well as equivalents thereof | Means-plus-function<br><br>Function: transmitting outgoing data frames over a wireless interface<br><br>Structure: "antenna 12" in Figure 1 as well as equivalents thereof |

Arista's proposed construction ignores the plain language of the patent and seeks to improperly restrict the means-plus-function element so as to render claim 17 inoperable. Arista's approach ignores fundamental engineering principles, and the very case law it relies on[1] and should be rejected.

---

[1] Arista attempts to rely on an analysis where a party incorporated functions relating to a working embodiment into the party's proposed construction. *JVW Enters., Inc. v. Interact Accessories*, 424 F.3d 1324, 1331 (Fed. Cir. 2005) ("Those functions are not recited explicitly in the claim but rather relate to a working embodiment disclosed in the '754 patent's written description."). Arista's citation misses the mark here, however, where Brazos relies only on a function in the language of the claims.

Brazos's and Arista agree the function should include "transmitting outgoing data frames over a wireless interface." But Arista seeks to omit functionality, implicit to the claim language, necessary to facilitate such a transmission. Arista's proposed functionality is half-formed, creating a gap in the claim language as to the functionality by which such a transmission can occur. By incorporating a *means* into the functionality, Brazos's proposed construction correctly aligns with the preface of claim 17 in which the patentee required a wireless node to comprise the function of a means for transmission—*e.g.*, a transmitter. Having described the function, Brazos's proposed structure corresponding to the patent's written description follows in form. Arista wrongly contends the '715 patent's disclosure at 4:16-19 is the "only disclosure in the patent that clearly links a specific structure." Arista's intrinsic evidence cites to FIG. 1 of the patent described in the specification as "illustrat[ing] the logical architecture of the impersonation detection system 1 according to the invention." '715 patent at 3:64-65. Shortly after this opening description of FIG. 1, the specification discloses the following:

> **4**
>
> secure link **30**. System **1** includes a respective transmitter unit **15** at node **10**, connected to a receiver unit **25** at intrusion detection module **20** over secure link **30**, operating according to a respective communication protocol. The language used for the exchange of information over the secure link **30** could be standardized for a better openness and for easing integration with third party intrusion detection systems available for wireless networks.

*Id*. at 4:1-2. Arista's proposed structure fails as the specification demonstrates the antenna is only one component of the node's transmitter. If Arista's structural proposal was correct, then the patentee would have had no reason to disclose a transmitter unit 15 at node 10. Arista's proposal ignores its own citation to and reliance on FIG. 1 showing the node 10 as supporting the antenna.

4

Arista's construction also jettisons basic tenets of RF design that the transmitting structure must encompass more than simply an antenna to perform a transmission. Polish Decl. at ¶¶ 36-41.



*Ex. 1* at FIG. 1. Arista's structure should not be adopted in the face of the patent's clear disclosures providing a corresponding structure (*e.g.*, a node 10) to the claim language (*e.g.*, a wireless node). *See B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (noting that a structure disclosed in the specification is a "corresponding" structure if the specification associates that structure to the function recited in the claim). Brazos's proposed structure of a node 10 of a wireless network in accordance with the procedure set forth in the specification (which includes a transmitter unit *and* an antenna) provides the clearest structure for a "means for transmitting outgoing data frames over a wireless interface" and the Court should so adopt.[2]

---

[2] *See also* Polish Decl. ¶¶ 33-41.

2.    *"connection means between the wireless node and the intrusion detection module for providing the intrusion detection module with a copy of the original data frames"*

| Claim Language | Agreed Construction |
|---|---|
| "connection means between the wireless node and the intrusion detection module for providing the intrusion detection module with a copy of the original data frames" ('715: 10) | Means-plus-function<br><br>Function: providing the intrusion detection module with a copy of the original data frames<br><br>Structure: "secure link 30, operating according to a respective communication protocol" in Figure 1 as well as equivalents thereof |

Brazos agrees to adopt Arista's proposed construction of this term.

**B.    U.S Patent No. 8,472,447**

The '447 patent – titled "Mechanism for detection of attacks based on impersonation in a wireless network" – provides method and system claims directed to aggregation switches connected via a virtual fabric link (VFL) that are able to perform IP multicast snooping. There are only two terms in dispute. First, "Chassis Management Module"—a common physical component of switches, which has a well-known structural meaning to those skilled in the art and even those who are not. Arista urges this Court to construe this common off-the-shelf hardware component as a means-plus-function claim so that Arista can then later contend the claim is indefinite. Arista's gambit should be rejected. Second, "multicast index"—a term for which Arista offers a construction that violates basic principles of construction law by seeking a construction that applies to only one of several embodiments.

1.    *"aggregation switch"*

| Claim Language | Agreed Construction |
|---|---|
| "aggregation switch" ('447:1, 3-5, 12-16) | "a network switch residing at the aggregation layer." |

2.      *"Chassis Management Module"*

| Claim Language | Brazos's Construction | Defendant's Construction |
|---|---|---|
| Chassis Management Module ('447: 1, 5, 12,-14) | Plain and ordinary meaning; no construction necessary. | Means-plus-function<br><br>Functions:<br><br>• receiving the snooping information via at least the external ports, storing the snooping information within the database and sharing the snooping information substantially in real-time with the remote aggregation switch via the VFL (claim 1)<br><br>• building respective forwarding vectors for multicast traffic flows received from the at least one network node via the external ports or the VFL ports based on the snooping information (claim 1)<br><br>• determining a multicast index for a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast traffic flow via the at least one edge node (claim 1)<br><br>• receiving a portion of the snooping information form the remote aggregation switch via the VFL (claim 5)<br><br>• building the forwarding vector for the receiving multicast traffic flow based on the multicast index (claim 12)<br><br>• allocating the multicast index for the received multicast traffic flow and sharing the multicast index with the secondary switch (claim 13)<br><br>• receiving the multicast index from the primary switch (claim 14)<br><br>Structure: Indefinite<br><br>Alternatively, even if not means-plus-function, is still indefinite. |

As is the case here, "[w]hen a claim term lacks the word 'means,'" there is a presumption that § 112 ¶ 6 does not apply. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). A party seeking to overcome that presumption must supply "evidentiary support for [its] position." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007–08 (Fed. Cir. 2018). Specifically, it must "demonstrate[] that the words of the claim are *not* understood by

persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *SecurityProfiling, LLC v. Trend Micro Am., Inc.*, No. 3:17-CV-1484-N, 2018 WL 4585279, at \*3 (N.D. Tex. Sept. 25, 2018) (emphasis in original). Indeed, "if a limitation recites a term with *a known structural meaning*, or recites either a *known or generic term with a sufficient description of its operation*, the presumption against means-plus-function claiming remains intact." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014) (emphases added) (note that this is overruled on other grounds). If "the intrinsic record" or "extrinsic evidence" show that the words at issue refer to particular structure, the presumption stands, and § 112 ¶ 6 does not apply. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1024 (Fed. Cir. 2006). Arista has completely failed to carry its burden to rebut this presumption.

As demonstrated below, there is no serious dispute that the term "chassis management module" has a well-understood meaning in the art with known structure. This fact is fatal to Arista's position because "***[w]here a claim term has an understood meaning in the art, it recites sufficient structure***" to avoid means-plus-function treatment. *Chrimar Sys., Inc. v. Alcatel-Lucent USA, Inc.*, No. 6:15-CV-163-JDL, 2016 WL 1228767, at \*6 (E.D. Tex. Mar. 28, 2016); *Williamson*, 792 F.3d at 1348 ("In making the assessment of whether the limitation in question is a means-plus-function term subject to the strictures of § 112, para. 6, . . . the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.").

> a)  *Chassis Management Module is a Well-Known Term of Art Not Subject to Means-Plus-Function Treatment.*

As an initial matter, Arista claims the specification "only" describes the "chassis management module" functionally. Opening Br. at 11. Not so. In fact, the opposite is true. The

very first mention of the term in the specification extensively describes the "chassis management module" in terms of its structure stating:

> The network interface modules 152 and ***chassis management modules 150 each include one or more processing devices, such as a microprocessor, micro-controller, digital signal processor, microcomputer, central processing unit, field programmable gate array, programmable logic device, state machine, logic circuitry, analog circuitry, digital circuitry, and/or any device that manipulates signals (analog and/or digital) based on hard coding of the circuitry and/or operational instructions***. The NIMs 152 and ***CMMs 150 also include a memory that is an internal memory or an external memory***. The memory may be a single memory device or a plurality of memory devices. Such a memory device may be a read-only memory, random access memory, volatile memory, non-volatile memory, static memory, dynamic memory, flash memory, cache memory, and/or any device that stores digital information. ***In addition, the NIMs 152 and CMMs 150 may implement one or more of their functions via a state machine, analog circuitry, digital circuitry, and/or logic circuitry, the memory storing the corresponding operational instructions may be embedded within, or external to, the circuitry comprising the state machine, analog circuitry, digital circuitry, and/or logic circuitry***. Furthermore, the NIMs 152 and CMMs 150 may execute hard-coded and/or software and/or operational instructions stored by the internal memory and/or external memory to perform the steps and/or functions described herein and may be implemented in a single or in one or more integrated circuits.

Ex. 2 at 23:25-51.

Arista complains that this language is too broad in that it overlaps with the structure of network interface modules, but is unable to explain why that matters to the current analysis. That some other term may have a similar structure is irrelevant. The only question is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. *SecurityProfiling,* 2018 WL 4585279, at *3. Here, the specification shows that this term does. Moreover, though Brazos disagrees that this language is broad, breadth is of no moment. *Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*, No. 16-CV-05251-EJD, 2017 WL 4410174, at *13 (N.D. Cal. Oct. 4, 2017) (written description "set[ ] out a broad class of structures, but it is structure nonetheless."). Moreover, it is also worth noting, the term "chassis management module" is nowhere near as broad as the term "means." By swapping

"means" for the well-known component "chassis management module," Arista—in hopes of having the term found indefinite—greatly expands the scope of the claim by allowing for any means to perform the recited acts found in the claims. This is improper. *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009) ("It was improper to "expand the scope of the claims far beyond anything described in the specification."); *Beacon Adhesives, Inc. v. United States*, 134 Fed. Cl. 26, 39 (2017) (proposed construction "erroneously expands the scope of the term beyond the clear meaning in the specification.").

The prosecution history also indicates that "chassis management module" is not indefinite and "refer[s] to particular structure" *DePuy*, 469 F.3d at 1024. The prosecution history contains no indication that the examiner believed this claim to be a means-plus-function claim or indefinite. Indeed, in making a non-final rejection, the examiner repeatedly stated that the prior art Weyman reference taught a "snooper module" that was a "chassis management module" indicating that the examiner—one having skill in the art—understood the meaning of the term "chassis management module." Ex. 4 at 3-5; *EcoServices, LLC v. Certified Aviation Servs., LLC*, No. CV 16-01824-RSWL-SPX, 2017 WL 2783486, at *7 (C.D. Cal. May 18, 2017), *aff'd*, 830 F. App'x 634 (Fed. Cir. 2020) (The actions of the examiner supported the argument that claim term was not a means-plus-function term).

In order to avoid this result, Arista relies heavily on the fact that the term in *Williamson* included the word module. Arista misses the point. In *Williamson*, "the word 'module' [did] not provide any indication of structure ***because it sets forth the same black box recitation of structure for providing the same specified function as if the term 'means' had been used***." 792 F.3d at 1350 (emphasis added). As described above, that is not the case here where the structure—even if broad—is laid out in the specification. "This distinguishes this case from *Williamson*, where there

was a ***made-up name for a black box software module***." *Quanergy*, 2017 WL 4410174, at \*13 (emphasis added).[3]

The extrinsic evidence is even stronger and proves beyond doubt that "chassis management module" "has an understood meaning in the art" and therefore "recites sufficient structure." *Chrimar*, 2016 WL 1228767, at \*6. First, it is important to note that a "chassis management module" is not "a made-up name for a black box software module" like the module at issue in *Williamson*. *Quanergy*, 2017 WL 4410174, at \*13. Rather, it as physical item, long-known in the art that can be purchased and delivered to you with the click of a button. For instance, one could purchase the IBM Flex System Chassis Management Module shown below for $210.53 from harddiskdirect.com:



Ex. 5. Alternatively, one could purchase the Alcatel Os8800 Chassis Management Module for $1149.94 from directmacro.com:

---

[3] The other cases cited by Arista are similar and demonstrate Arista's error in claiming "chassis management module" is a means-plus-function term. Opening Br. at 9. In *Grecia v. Samsung Elecs. Am., Inc.*, 780 F. App'x 912, 914-16 (Fed. Cir. 2019), the court found that "customization module" a means-plus-function term because the patent gave no indication it had a known meaning nor described how it operates. The opposite is true here. Similarly, this Court held in *Dyfan, LLC v. Target Corp.*, No. W-19-CV-00179-ADA, 2020 WL 8617821, at \*6 (W.D. Tex. Nov. 25, 2020) that a term "defined only by the function it performs" is subject to mean-plus-function treatment. That is not the case here where the specification, file history, and extrinsic evidence all disclose a well-known structure for the term chassis management module.



Ex. 6; *see also* Ex. 7 (OS9800-CMM - ALCATEL-LUCENT OS9800 CHASSIS MANAGEMENT MODULE). Indeed, there is no shortage of options when it comes to purchasing an off the shelf chassis management module alone or with a chassis switch. *See*, *e.g.*, Ex. 8 (Lenovo, Flex System Chassis Management Module User's Guide, 5 et passim (7th ed. 2020)); Ex. 9 (Alcatel, OmniSwitch® 8800, at 1, 51–53 et passim (Apr. 2004)); Ex. 10 (Alcatel, OmniSwitch® 9000/9000E, at 12–14 (Aug. 2009)); Ex. 11 (Alcatel-Lucent, Alcatel-Lucent OmniSwitch 9900 Series, at 1–14 (Dec. 2019)).

The last two decades of patent and academic literature are also replete with references to and descriptions of "chassis management modules." For instance, U.S. Patent No. 7,173,817, which is assigned to Intel Corporation, and claims priority to April 2003 is titled "Front Side Hot-Swap Chassis Management Module." Ex. 12. The '817 Patent describes "chassis management modules" in great detail. Ex. 12. So too with U.S. Patent No. US 7,398,401, also assigned to Intel, which claims priority to September 2005 and is titled "Method and Apparatus for Communicating Information from an Operating System Based Environment of a Server Blade to the Chassis Management Module." Ex. 13; *see also* Ex. 14 (U.S. Patent No. 8,166.539 assigned to Dell Products that describes Chassis Management Modules). Indeed, a search of the Patent Office's databases reveals two hundred and one issued patents and two hundred and forty-three patent applications that use the term "chassis management module." Polish Decl. ¶ 50.

Descriptions of the "chassis management module" in the academic literature are legion. For instance, the article Kawasaki et al., *ATCA Survey Systems for Telecommunications Services*, 47 FUJITSU SCI. TECH. J. 215, 217 (2011) , demonstrates that the "chassis management module" is a known physical component of the ATCA server system as shown below:



Ex. 15. Similarly, the article Norton et al*., Blade Management Controller Rides FPGA Embedded Processor*, 68 XCELLENCE IN WIRED COMMS 14, 15, 20 (2009), describes a chassis management module in the context of the described system and demonstrates how it is connected to other physical components in the system:



Ex. 16. There are many more published articles, manuals, and presentations that use this term and explain what a "chassis management module" is and what it does. *See*, *e.g.*, Ex. 17 (Banikazemi et al., *Sysman: A Virtual File System for Cluster System Management*, IBM RESEARCH REPORT, at 10, 13 (2007)); Ex. 18 (Lenovo, *ThinkSystem SN550 Compute Node Setup Guide*, at 5 (2017)); Ex. 19 (Sandeep Singh, *What is Chassis Management Controller in UCS*, CISCO (2009)); Ex. 20 (IBM, BLADECENTER CHASSIS MANAGEMENT, at 945 (2005); Ex. 21 (Banikazemi et al., Sysman: A Virtual File System for Managing Clusters, USENIX ASSOCIATION, at 7 (2008)); Ex. 22 (Lennart Johnsson, Professor, Univ. of Houston, The Impact of Moore's Law and Loss of Dennard Scaling, at 15 (Feb. 6, 2015)); Ex. 23 (Hasegawa et al., IP Service Control Point and Signaling Gateway for IP Common Channel Signal Network, 7 NTT DOCOMO TECH. J. 27, 30 (2006)). In view of the intrinsic and extrinsic evidence it is beyond reasonable dispute that "chassis management module" "has an understood meaning in the art" and therefore "recites sufficient structure."[4] *Chrimar*, 2016 WL 1228767, at *6. It also shows that "chassis management module" is not "a made-up name for a black box software module" like the module at issue in *Williamson*. *Quanergy*, 2017 WL 4410174, at *13.

Finally, Arista hangs its hat on the argument that the claims and specification recite functions performed by the "chassis management module" and that, therefore, this must be a means-plus-function term. That is not the law. It is well-established that "Section 112, ¶ 6 does not apply to all functional claim language." *Huawei Techs. Co. v. Verizon Commc'ns, Inc.*, No. 2:20-

---

[4] Despite the fact that "chassis management module" is plainly well-known to those having skill in the art, Arista's "expert" Dr. Black testifies, "The term on its own, 'chassis management module,' is not one that I am familiar with . . . . In my opinion, 'chassis management module' is not a term of art, and it does not have a well understood meaning." Dkt. 28-13. Five minutes on Google and Google Scholar would have shown Dr. Black that this is a well-known term of art with a well-understood meaning and structure.

CV-00030-JRG, 2021 WL 150442, at *4 (E.D. Tex. Jan. 15, 2021); *U.S. Well Servs., LLC v. TOPS Well Servs.*, No. 3:19-CV-00237, 2020 WL 9439469, at *5 (S.D. Tex. Sept. 18, 2020) (same); *Total Rebuild, Inc. v. PHC Fluid Power, L.L.C.*, No. 6:15-CV-1855, 2019 WL 2448305, at *5 (W.D. La. June 10, 2019) (same). In short, the mere fact that the claims describe acts performed by the "chassis management module" is insufficient to show that it is a means-plus-function term. Arista has failed to carry its burden to demonstrate that this is a means-plus-function term.[5] Accordingly, no construction is necessary.

> b) *The Specification Discloses Sufficient Structure for the Functions Performed by the Chassis Management Module in the Claims.*

The term "chassis management module" or CMM is well-known, has a well-known structure, and cannot be subject to the strictures of § 112, ¶ 6. *Williamson*, 792 F.3d at 1348. Nonetheless, Arista is also wrong that the specification does not provide structure for the various claims in question. As an initial matter, Arista alters the language of the claims in order to reach its desired result, changing verbs to gerunds in hopes the claims will appear more like means-plus-function claim terms. *Compare* Opening Br. at 12 *with* Ex. 2 '447 Patent at cls. 1, 5, 12-14. At any rate, the specification is replete with structure for each of these terms:

- **receiving the snooping information via at least the external ports (claim 1)**: This element finds structural support in columns: 6:13-14; 22:56-66; 23:56-63; 19:12-18. These passages describe how snooping information is received at IP interface 412a and in turn to 410a, which is the PIM router for MCLAG VLAN. *See* 7:33-38 (an external port interface may, *e.g.*, include MC-LAG). The snooping information is received via the MC-LAG

---

[5] In its disclosures, Arista contended "even if not means-plus-function, [the term] is still indefinite." Arista offers no argument in support of this contention. Accordingly, that argument is waived. Even were it not, the evidence above plainly establishes that the term is not indefinite.

which are the external ports. *See* 19:32-45 (the IP multicast snooping information (IPMS) can be processed on each CMM).

- **storing the snooping information within the database (claim 1)**: This element finds structural support in columns: 19:32-35; 19:65-20:7; 20:16-28; 23:4-7; 23:56-63. As the specification explains in at least two separate embodiments, "CMM-P 150 also shares the derived IP multicast snooping information (*i.e.*, the query information) 406 with CMM-S on Aggregation Switch 106 b via NIM 152 b/port 240 b, VFL 124 and NIM 152 e/port 240 e" and "***CMM-P 150 shares the IP multicast snooping information 406 with CMM-S 150 on the remote Aggregate Switch 106 b via VFL 124*** and ports 240 b and 240 e." *Id.* at 21:5-25; 21:61-22:7.

- **sharing the snooping information substantially in real-time with the remote aggregation switch via the VFL (claim 1)**: This element finds structural support in columns: 3:65-4:2; 5:1-9; 18:48-56; 19:1-13; 19:35-41; 21:5-25; 20:16-28. As the specification explains, "the report 15 403a is sent over the link coupled to port 240c, CMM-S 150 will "learn" about the report 403a as if it were received on port 240d" and "CMM-P 150 also shares the derived IP multicast snooping information (*i.e.*, the flow information) 406 with CMM-S on Aggregation Switch 106b via NIM 152b/ port 240b, VFL 124 and NIM 152e/port 240e." *Id.* at 21:5-25; 20:16-28.

- **build respective forwarding vectors for multicast traffic flows received from the at least one network node via the external ports or the VFL ports based on the snooping information (claim 1):** This element generally finds structural support throughout columns 19-25, especially in: 19:65-20:14; 20:24-28; 20:39-45; 20:55-57; 21:1-4; 23:52-63. The specification explains that "[t]he CMM-P further uses the hardware device

information to compute a forwarding vector 407 a for the IP multicast traffic 404" and "[t]he CMM-P may further use the hardware device information to compute a forwarding vector 407a for the IP multicast data stream requested by the home network device 112a in the report 403a" and "***CMM-P 150 on Aggregation Switch 106 a accesses the database 405 a to store/retrieve IP multicast snooping information and to compute the replication vector, forwarding vector and multicast index for the multicast traffic 404*** to switch the multicast traffic 404 to the appropriate external ports for forwarding to the VLANs." *Id.* at 19:65-20:14; 21:1-4; 23:57-63.

- **determines a multicast index for a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast traffic flow via the at least one edge node (claim 1):** This element finds structural support in Figures 11 and 12 and columns: 23:13-24; 23:56-24:35. The specification explains "the CMM-P is further responsible for creating the multicast index 409 for a particular received multicast stream (e.g., multicast traffic 404) and for sharing the multicast index 409 with the CMM-S 150 on the Secondary Aggregation Switch 106b via the VFL 124" and the "***CMM-P 150 on Aggregation Switch 106a accesses the database 405a to store/retrieve IP multicast snooping information and to compute the replication vector, forwarding vector and multicast index for the multicast traffic 404 to switch the multicast traffic 404 to the appropriate external ports for forwarding to the VLANs*** containing home network devices that requested the multicast traffic 404" and "Upon receiving the multicast traffic via the VFL 124, the CMM (CMM-S) 150 in Aggregation Switch 106 b accesses the database 405 b to store/retrieve IP multicast snooping information associated with the multicast traffic

404 and to compute the forwarding vector for the multicast traffic 404. ***The forwarding vector in Aggregation Switch 106 b would indicate that the multicast traffic 404 should be forwarded over port 1 of Switching ASIC MID=63 to Edge Node C 104 c.***" *Id.* at 23:13-24; 23:56-64; 24:18-26.

- **receives a portion of the snooping information from the remote aggregation switch via the VFL (claim 5):** This element finds structural support in Figure 13 and columns: 24:46-25:5. The "chassis management module" is included in aggregation switches and receives a portion of the snooping information as described. *See* 19:12-18 ("The Aggregation Switches 106 a and 106 b each include at least one respective CMM 150"). Specifically, "[t]he local and remote Aggregation Switches then continue to share any newly discovered IP multicast snooping information there between" and "at transition 507, when the local Aggregation Switch is enabled, the state changes to mchas_full 502, the MCHAS_UP message is sent to the remote Aggregation Switch and ***the IP multicast snooping information is shared between the local and remote Aggregation Switches*** (previously learned and newly discovered)." *Id.* at 24:46-25:5.

- **builds the forwarding vector for the receiving multicast traffic flow based on the multicast index (claim 12):** This element finds structural support in Figures 11 and 12 and columns: 23:18-24; 20:39-45. The specification explains "[t]he CMM-P further uses the hardware device information to compute a forwarding vector 407 a for the IP multicast traffic 404. The forwarding vector 407 a represents the internal switching of the IP multicast traffic 404 from the source port (external port 240 a) to one or more VLAN ports for forwarding of the IP multicast traffic 404 to the home network devices 112 that requested the IP multicast traffic" and "CMM-P 150 on Aggregation Switch 106 a accesses

the database 405 a to store/retrieve IP multicast snooping information and ***to compute the replication vector, forwarding vector and multicast index for the multicast traffic 404*** to switch the multicast traffic 404 to the appropriate external ports for forwarding to the VLANs" *Id.* at 20:39-45; 23:57-62.

- **allocates the multicast index for the received multicast traffic flow and sharing the multicast index with the secondary switch (claim 13):** This element finds structural support in columns: 18:66; 22:48-62; 23:4-13; 24:6-7; 24:14-35. The process is explained as "the CMM-P is further responsible for creating the multicast index 409 for a particular received multicast stream (*e.g.*, multicast 15 traffic 404) and for ***sharing the multicast index 409 with the CMM-S 150 on the Secondary Aggregation Switch 106b via the VFL 124***." *Id.* at 23:4-13 (emphasis added).

- **receives the multicast index from the primary switch (claim 14):** This element finds structural support in Figure 13 and columns: 23:4-13; 24:31-43. The process is explained as "the CMM-P 150 on the Primary Aggregation Switch 106a is also responsible for computing the replication vector 408 for a multicast stream and storing the replication vector 408 in the database 405a. The replication vector 408 provides a list of VLAN ID's for which a packet needs to be replicated at a single port (this applies to a scenario where multiple VLAN's are aggregated on a single port). The replication vector 408 is also shared with the Secondary Aggregation Switch 106b via the VFL 124 and maintained within the secondary database 405b by CMM-S 150. Moreover, the CMM-P is further responsible for creating the multicast index 409 for a particular received multicast stream (e.g., multicast 15 traffic 404) and ***for sharing the multicast index 409 with the CMM-S 150 on the Secondary Aggregation Switch 106b via the VFL 124***. . . Since multicast flows may be

19

passed over the VFL 125, the multicast indices are a globally shared resource between switches 106 a and 106 b." 23:4-24.

In sum, "chassis management module" is not a means-plus-function term. It is a well-known term of art with well-defined structure. Nonetheless, even in the event the Court construes this term as a means-plus-function term, it is not indefinite.

### 3.   *"multicast index"*

| Claim Language | Brazos's Construction | Defendant's Construction |
|---|---|---|
| "multicast index" ('447: 1, 3, 4, 12, 13, 14, 15) | Plain and ordinary meaning; no construction necessary.<br>Alternatively, "a unique identifier assigned to an ingressing multicast flow." '447 Patent at 23:18–24. | "a unique identifier assigned to an ingressing multicast flow based on the IP source, the destination address and ingress VLAN that enables each port to determine whether or not to forward the multicast flow" |

"Multicast index" is a term of art which would have been well understood by POSITAs in the field of computer networking at the time of the '447 patent's filing date. Thus, plain and ordinary meaning is sufficient and no construction should be required. To the extent the Court believes an explicit construction would provide clarity, Brazos has proposed an alternative construction consistent with *both* the prior art and the patent itself. Arista's proposed construction, on the other hand, attempts to import the disclosures of *a single embodiment* into each and every claim of the '447 patent. The Court should reject Arista's proposal and either afford the term its plain and ordinary meaning or should adopt Brazos's alternative construction.

The patentee did not act as her own lexicographer in the '447 patent when providing context to the term multicast index in one embodiment. The Federal Circuit case Arista selectively quotes stands only for the proposition that the word "is" by a patentee might suggest a patentee is intending to act as her own lexicographer. *See Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,

511 F.3d 1132, 1136 (Fed. Cir. 2007) ("Moreover, the word 'is,' again a term used here in the specification, **may** 'signify that a patentee is serving as its own lexicographer.'") (emphasis added) (citation omitted). But in *Sinorgchem,* the Federal Circuit only found the patentee intended to act as its own lexicographer when this suggestion was combined with the use of quotation marks – a "strong indication that what follows is a definition."[6] *Id.* (citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed.Cir.2000) (finding that the claim term "water-soluble polydextrose" was expressly defined in the specification)); *see SEVEN Networks, LLC v. Apple Inc.*, 2:19-CV-115-JRG, 2020 WL 1536152, at *41 (E.D. Tex. Mar. 31, 2020) (finding that "the quotation marks around 'activity session' reinforce the clarity of the lexicography").

Further, Arista argues the term is in contrast to other passages "that explicitly state that they are discussing only an embodiment" but provides no legal authority for the position that the patentee was required to reference an embodiment. Arista cites its own expert declaration but this cannot substitute for the law. Arista has offered no basis for why, despite the patent disclosing several embodiments, *all* the patent's embodiments and claims should be governed by the patentee's use of a well-known term of art in a single embodiment directed only as to FIG. 11. *Contra Phillips*, 415 F.3d at 1323 ("That is not just because section 112 of the Patent Act requires that the claims themselves set forth the limits of the patent grant, but also because [POSITAs] rarely would confine their definitions of terms to the exact representations depicted in the embodiments."); *Saint Lawrence Communications LLC v. Apple Inc.*, 2:16-CV-82-JRG, 2017 WL 2874526, at *14 (E.D. Tex. July 5, 2017) (finding that when a patentee's disclosure referred to a

---

[6] Arista also attempts to rely on *Sol IP, LLC* but defendants there were referring to a disclosure in the patent *in general* rather than as to any particular embodiment. *See Sol IP, LLC v. AT&T Mobility LLC*, 2:18-CV-00526, 2019 WL 6878836, at *15 (E.D. Tex. Dec. 17, 2019). This contrasts directly with the present matter where Arista cites to a particular embodiment in which the term is used, not the term generally.

preferred embodiment, it amounted to contrary to the notion that a patentee has set forth a definition of a term at-dispute). Further, Arista's assertion that the term appears in only column of the patent is misleading—the term appears in *more than one embodiment* in column 23, including an embodiment that continues on to column 24 (and accompanies FIG. 12). *See* Ex. 2 '447 patent at 22:35-23:51, 23:64-24:35.

Additionally, both parties' constructions require that the multicast index is "a unique identifier assigned to an ingressing multicast flow." As the term "multicast flow" appears in several embodiments, including that of column 23, interpreting the claim term according to Arista's proposal would exclude multiple preferred embodiments—in violation of black letter patent law. *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("While we are mindful that we cannot import limitations from the preferred embodiments into the claim, we also should not normally interpret a claim term to exclude a preferred embodiment."); *see* Ex. 2 '447 Patent at 5:1-9, 18:51-59, 19:45-50 (disclosing embodiments utilizing multicast flows).

Nor is it accurate that Brazos has omitted the patentee's alleged definition of the term. The patentee did not provide a generally-applicable, clear definition as to the term "multicast index" that should apply to the full array of claims in the '447 Patent.

The claim language supports giving this term its plain and ordinary meeting. Claims 1 and 15 provide that the multicast index is determined "for a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast traffic flow via the at least one edge node" and that it is used "globally between the aggregation switch and the remote aggregation switch." Ex. 2 '447 Patent at cls. 1, 15. Dependent claims of the patent also utilize the term in accordance with its plain and ordinary meeting. *See Id.* at cl. 12 (building a forwarding vector

based upon the multicast index); *id.* at cl. 13 (allocating the multicast index according to a primary switch for a received multicast traffic flow and sharing the multicast index with a secondary switch); *id.* at cl. 14 (allocating the multicast index according to a secondary switch for a received multicast traffic flow and sharing the multicast index with a primary switch).

Extrinsic evidence leads to the same result. The Microsoft Press Computer Dictionary defines "multicasting" as "the process of sending a message simultaneously to more than one destination on a network." Ex. 24 at 301. IBM's Dictionary of Computing defines "multicast" as "transmission of the same data to a selected group of destinations." Ex. 25 at 443. Likewise, the term is practiced by POSITAs in the field of computer networking. Cisco's NX-OS operating system, which can be found on its 7000 series switches, uses the term "multicast index" for its port index manager (PIXM):



Ex. 27 (CISCO, NEXUS 7000: M3 MULTICAST FORWARDING 6 (2017)). But most notably amongst the extrinsic evidence that Brazos disclosed is Arista's *own use* of multicast ID indexes (i.e., multicast indices) in its own 7050X series network switches and architecture:

23

The logic for multicast traffic is virtually identical, with multicast routes occupying the same tables as the unicast routes.  However instead of providing egress port and rewrite information, the adjacency points to a Multicast ID. The Multicast ID indexes to an entry in the multicast expansion table to provide a list of output interfaces.

**STAGE 5: INGRESS ACL PROCESSING**



**Figure 9:** Packet Processor stage 5: Ingress ACL Processing

Ex. 26 (Arista, *Arista 7050X Switch Architecture ('A day in the life of a packet')* 12 (2014)). That Arista uses the term in its own network hardware only underscores its plain and ordinary meaning and the lack of a need for construction.

In the alternative, Brazos offers a construction of "a unique identifier assigned to an ingressing multicast flow" which provides clarity while keeping in alignment with what a POSITA would understand the term to mean.[7] This is in keeping with the language of the specification and the claims without any unnecessary narrowing of the term like the "based on" clause suggested by Arista. While Arista can cite to only one passage of one embodiment for support, the "based on" clause does not appear anywhere else in the patent. To the contrary, "multicast index" appears in another embodiment which discloses that it is to be used for "the multicast traffic **404** to switch the multicast traffic **404** to the appropriate external ports for forwarding to the VLANs containing home network devices that requested the multicast traffic **404**." Ex. 2 '447 Patent at 23:60-63. Here, the patentee did not disclose that the multicast index in this embodiment needed to be "based on" any additional parameters and, instead, provided that it was simply "***compute[d]***" along with the replication vector and forwarding vector. *Id*. at 23:56-59. This embodiment echoes the term's

---

[7] *See* Polish Decl. at ¶ 55-59.

use in the claims including, *e.g.*, claims 1 and 15 where the multicast index is "***determine[d]***" for "a received multicast traffic flow to set-up hardware paths for forwarding the received multicast traffic flow to the external ports in a virtual local area network (VLAN) that requested the received multicast traffic flow via the at least one edge node." *Id.* at cls. 1, 15. The patentee's intentions were clear and Arista's "based on" restrictions stemming from one passage of the patent should be disregarded when evaluating the term and patent as a whole.

### C.    U.S Patent No. 9,450,884

The '884 patent – titled "Software Defined Networking Based Congestion Control" – provides method and systems of adjusting bandwidth allocation by a network element in a communications network. The only term in dispute is "the network switching element."

### 1.    *"the network switching element"*

| Claim Language | Brazos's Construction | Defendant's Construction |
|---|---|---|
| "the network switching element" ('884: 17, 20) | Plain and ordinary meaning; no construction necessary.[8] | Indefinite |

The "lack of an antecedent basis does not render a claim indefinite as long as the claim 'apprises one of ordinary skill in the art of its scope and, therefore, serves the notice function required by [§ 112 ¶ 2].'" *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018) (quoting *In re Packard*, 751 F.3d 1307, 1310, 1314 (Fed. Cir. 2014)). Whether a claim, "despite lack of explicit antecedent basis … nonetheless has a reasonably ascertainable meaning must be decided in context." *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006).

---

[8] Brazos originally offered an alternative construction based on the possibility of Arista arguing the term was indefinite in general. It has, however, become clear that Arista's only complaint is that the term lacks antecedent basis. Accordingly, Brazos withdraws its alternative construction.

The claims should be "construed in the context of the specification and prosecution history, as they would be understood by persons in the same field of endeavor." *Id.*, at 1369 (citing *Phillips*, 415 F.3d at 1313). Arista must prove by clear and convincing evidence that a claim is indefinite because it lacks an antecedent basis. *See Flash-Control, LLC v. Intel Corp.*, No. 1:19-CV-01107-ADA, 2020 WL 4561591, at *12 (W.D. Tex. July 21, 2020), *aff'd*, No. 2020-2141, 2021 WL 2944592 (Fed. Cir. July 14, 2021) (citing *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011)). *See also BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (defendant has "the burden of proving indefiniteness by clear and convincing evidence").

Claims 17 and 20 are not indefinite for lack of antecedent basis because the term "the network switching element" has antecedent basis in both the claims: "an edge switch" in claim 17 and "an aggregation switch" in claim 20. Further, a person skilled in the art ("POSITA") would ascertain with reasonable certainty that the term "the network switching element," when read in light of the '884 patent's specification and prosecution history, should be given a plain and ordinary meaning to refer to switches of the communications network, including one or more of core switch, edge switch, and aggregation switch.

> a)   *A POSITA Would Ascertain the Scope of "The Network Switching Element" with Reasonable Certainty in the Context of the Specification.*

The patent aims to solve network congestion by adjusting bandwidth allocation through the switches and/or the network controller. *See* Ex. 3 '884 Patent, 3:65-67 ("At least one example embodiment relates to an edge switch for adjusting bandwidth allocation in a communications network"); 4:45-47 ("According to an example embodiment, a SDN controller for adjusting bandwidth allocation in a communications network is provided"); 2:58-62 ("According to an example embodiment, a method of adjusting bandwidth allocation by a network controller in a communications network"); 11:13-24 ("In many data communications networks [] network

congestion may occur at the physical network switches . . . . Therefore, example embodiments provide for congestion management and/or congestion avoidance schemes for (i) edge switches (*e.g.*, edge switches 115) and (ii) aggregation/core switches (*e.g.*, aggregation switches 110 and core switch 105)").

The specification expressly provides that the network elements in a communications network comprise user agent, switches, network controller, and server stacks among others. *See id.*, at 7:62-64 ("Communications network 100 includes core switch 105, aggregation switches 110, edge switches 115, and server stacks 120"); 12:25-30 ("Receiver 350 may be configured to send digital data converted from a captured radio wave from one or more other network elements (*e.g.*, one or more servers of the server stacks 120, edge switches 115, aggregation switches 110, and core switch 105)"); 7:7-13 ("the term 'user agent' … may describe a remote user of network resources in a communications network"); 7:39-43 ("For example, program modules and functional processes discussed herein may be implemented using existing hardware at existing network elements or control nodes (*e.g.*, an edge switch, aggregation switch, or core switch as shown in FIG. 1"); 9:33-35 ("During operation, the network devices 205 may communicate with SDN controller 230 and/or one or more of the switches of communications network 100"). A POSITA would ascertain from the specification that the term "network element" is not a closest term to "network switching element" as pointed out by Arista, but a "network element" includes, but is not limited to the "network switching element".

Arista correctly points out that the term "network switching element" is not explicitly mentioned in the specification. Yet, it must be noted that Arista does not contend the term "network switch element" standing alone is indefinite. Rather, Arista only contends that the term "*the* network switching element" lacks antecedent basis in claims 17 and 20. The term "network

27

switching element" is found in several other asserted claims of the '844 Patent. *See*, *e.g.*, Ex. 3 '844 Patent, cls. 1, 11. Thus, Arista concedes that the term "network switching element" has an ordinary meaning, is not indefinite, and requires no construction.

The specification defines "the switches" as including edge switches, aggregation switches, and core switches and that one or more "switches of communication network" communicate with other network elements. *See id.,* at 7:65-66; 9:33-35. A POSITA would ascertain with reasonable certainty in the context of the specification that the term "the network switching element" refers to the "switches of communication network" that include one or more of an edge switch, aggregation switch, and core switch.

"[A]n antecedent basis can be present by implication." *Energizer Holdings, Inc.*, 435 F.3d at 1371 (citing *Slimfold Mfg. Co.*, 810 F.2d at 1116). *See also Flash-Control,* 2020 WL 4561591, at *12 ("Court also acknowledges Flash-Control's assertion that the antecedent basis can be implicitly found.").

Claim 17 is an apparatus claim that claims one type of switch discussed in the '884 patent: "an edge switch." Claim 17 recites:

> 17. ***An edge switch*** for adjusting bandwidth allocation in a communications network, the edge switch including a target port, ***the edge switch*** configured to:
>
> monitor a data flow traversing the target port;
>
> determine a bandwidth allocation for the target port, the bandwidth allocation for the target port being a bandwidth that is currently allocated for the data flow;
>
> determine a fair-share bandwidth allocation for the target port, the fair-share bandwidth allocation being a proportional allocation of a total bandwidth of ***the network switching element***; and
>
> adjust the bandwidth allocation for the target port based on the fair-share bandwidth allocation.

Claim 17 only recites a single type of network switching element—an edge switch. Thus, it would be clear to a POSITA that the term "the network switching element" in claim 17 can only refer to the "edge switch" and that edge switch provides antecedent basis for "the network switching element."

Similarly, claim 20 is an apparatus claim for an "SDN controller" to control a second type of switch discussed in the '884 patent: "an aggregation switch." It is apparent to a POSITA that the term "the network switching element" in claim 20 can only refer to the "aggregation switch" because the network switching element recited in the claim is an "aggregation switch."[9] Therefore, "an aggregation switch" provides sufficient antecedent basis for "the network switching element" in claim 20.

      b)     *A POSITA Would Ascertain the Scope of "The Network Switching Element" with Reasonable Certainty in the Context of the Prosecution History.*

Arista mistakenly contends that there is no explanation for "the network switching element." The anticipatory and obviousness rejections for claim 17 were overcome by differentiating the prior art (where the data monitoring was done on network elements that were not switches (*e.g.*, "user device," "resource")) from the '884 patent (where the data monitoring is done at network switching elements (*e.g.*, "core switches", "aggregation switches", "edge switches")) by pointing to the portion of the "network element" where the data monitoring is done – the "network switching element." *See* Ex. at 12 ("Ma does not monitor data traveling through a 'target port' of the proxy device 120, itself. Instead, Ma only monitors data flows from ports that

---

[9] "The network switching element" cannot refer to the SDN controller because the SDN controller "receives data flow information from the network switching element." Ex. 3 '884 Patent, cl. 20. Also, as pointed out by Arista, the specification provides that the switches "may include the SDN controller" as a component of the switch. '884 patent, 11:35-38. So, a "network switching element" cannot refer to the SDN controller.

are at the user device 110 or the resource 130, where the user device 110 and resource 130 are not a 'network <u>switching</u> element' (as recited in claim 1)."). Further, claim 20 was allowed without any objection by the examiner. This shows the examiner found sufficient explanation for "the network switching element" and understood that the specification has support for "network switching element" term in claims 17 and 20. Indeed, as mentioned above, Arista agrees there is support for this term as it does not claim the term "network switching element" is indefinite in general.

Further, the examiner did not reject any claims for indefiniteness. *See Energizer Holdings, Inc.*, 435 F.3d at 1370 (finding definiteness when "the examiner made several objections to the claims, but the claims were not rejected or objected to on the ground of lack of antecedent basis"); *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117 (Fed.Cir.1987) (quoting *Permutit Co. v. Graver Corp.*, 284 U.S. 52, 60 (1931) ("[T]he missing antecedent clause, the absence of which was not observed by the examiner of the original patent or [] in its reissue protest documents, did not fail to inform the public during the life of the [] patent of the limits of the monopoly asserted.").

In conclusion, for the reasons discussed above, claims 17 and 20 are not indefinite for lack of antecedent basis because the term "the network switching element" has an antecedent basis by implication in both the claims: "an edge switch" in claim 17 and "an aggregation switch" in claim 20. Further, a POSITA would ascertain with reasonable certainty that the term "the network switching element," when read in light of the '884 patent's specification and prosecution history, should be given a plain and ordinary meaning to refer to switches of the communications network, including one or more of core switch, edge switch, and aggregation switch.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should adopt Brazos's proposed constructions.

Dated: August 16, 2021

Respectfully submitted,

SUSMAN GODFREY L.L.P.


By: */s/ Shawn Blackburn*
    Max L. Tribble, Jr.
    Texas Bar No. 2021395
    Shawn Blackburn *(pro hac vice)*
    Texas Bar No. 24089989
    Bryce T. Barcelo *(pro hac vice)*
    Texas Bar No. 24092081
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666
    mtribble@susmangodfrey.com
    sblackburn@susmangodfrey.com
    bbarcelo@susmangodfrey.com

    Kalpana Srinivasan *(pro hac vice)*
    California Bar No. 237460
    1900 Avenue of the Stars, 14th Floor
    Los Angeles, California 90067-6029
    Telephone: (310) 789-3100
    Fax: (310) 789-3150
    ksrinivasan@susmangodfrey.com

**COUNSEL FOR PLAINTIFF WSOU
INVESTMENTS, LLC D/B/A BRAZOS
LICENSING AND DEVELOPMENT**


**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on August 16, 2021, a true and correct copy of the above and foregoing instrument was e-filed with the Court and e-served upon all counsel of record using the Court's Electronic Filing Service Provider in accordance with Rule 21(a)(1) of the Texas Rules of Civil Procedure and by electronic mail as indicated below.

31

Douglas E. Lumish
Jeffrey G. Homrig
Richard G. Frenkel
Linfong Tzeng
LATHAM & WATKINS, LLP
140 Scott Drive
Menlo Park, CA 94025
Doug.Lumish@lw.com
Jeff.Homrig@lw.com
Rick.Frenkel@lw.com
Linfong.Tzeng@lw.com

Paige Arnette Amstutz
SCOTT, DOUGLASS & MCCONNICO, LLP
303 Colorado Street, Suite 2400
Austin, TX 78701
pamstutz@scottdoug.com

Amit Makker
LATHAM & WATKINS, LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Amit.Makker@lw.com

/s/  *Shawn Blackburn*
Shawn Blackburn
Counsel for Plaintiff